

1    Christopher Ridout (SBN 143931)
        Email: Christopher.Ridout@zimmreed.com
2    Caleb Marker (SBN 269721)
        Email: Caleb.Marker@zimmreed.com
3    ZIMMERMAN REED LLP
     2381 Rosecrans Ave., Suite 328
4    Manhattan Beach, CA 90245
     (877) 500-8780 Telephone
5    (877) 500-8781 Facsimile

6

7    (Additional Counsel for Plaintiff Listed Below)

8

9

10                  **UNITED STATES DISTRICT COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**
                          **WESTERN DIVISION**
12

13   UNITED STATES OF AMERICA and      Case No.
     STATE OF CALIFORNIA *ex rel.*
14   [UNDER SEAL],                     CV20-02538-AB-PJWx

15             Plaintiff,              COMPLAINT

16        v.                          FILED IN CAMERA AND
                                      UNDER SEAL PURSUANT TO
17   [UNDER SEAL].                    31 U.S.C. § 3730(b)(2)

18             Defendants.

19

20                                    DEMAND FOR JURY TRIAL

21

22

23                    PAID

24
                   MAR 17 2020
25
              Clerk, US District Court
26                  COURT 4612

27

28
                          COMPLAINT

FILED

1   Christopher Ridout (SBN 143931)
        Email: Christopher.Ridout@zimmreed.com
2   Caleb Marker (SBN 269721)
        Email: Caleb.Marker@zimmreed.com
3   ZIMMERMAN REED LLP
    2381 Rosecrans Ave., Suite 328
4   Manhattan Beach, CA 90245
    (877) 500-8780 Telephone
5   (877) 500-8781 Facsimile

2020 MAR 17   AM 11: 39

6

7   (Additional Counsel for Plaintiff Listed Below)

8

9

10                  **UNITED STATES DISTRICT COURT**
11                  **CENTRAL DISTRICT OF CALIFORNIA**
                          **WESTERN DIVISION**
12

13   UNITED STATES OF AMERICA and      Case No.
     STATE OF CALIFORNIA *ex rel.*
     [UNDER SEAL],                     **CV20-02538-AB-PJWx**
14
                                        COMPLAINT
15              Plaintiff,
                                        FILED IN CAMERA AND
16        v.                            UNDER SEAL PURSUANT TO
                                        31 U.S.C. § 3730(b)(2)
17   [UNDER SEAL].
18              Defendants.
19                                      DEMAND FOR JURY TRIAL
20
21                                      PAID
22
                                        MAR 17 2020
23
24                                      Clerk, US District Court
                                              COURT 4612
25
26
27
28   ───────────────────────────────────────
                        COMPLAINT

1   Christopher Ridout (SBN 143931)
        Email: Christopher.Ridout@zimmreed.com
2   Caleb Marker (SBN 269721)
        Email: Caleb.Marker@zimmreed.com
3   ZIMMERMAN REED LLP
    2381 Rosecrans Ave., Suite 328
4   Manhattan Beach, CA 90245
    (877) 500-8780 Telephone
5   (877) 500-8781 Facsimile

6
    (Additional Counsel for Plaintiff Listed Below)
7

8

9

10                **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
11                    **WESTERN DIVISION**

12

| | |
|---|---|
| 13   UNITED STATES OF AMERICA and STATE OF CALIFORNIA *ex rel.* ANTHONY MILLS, M.D., | Case No. |
| 14 | |
| 15              Plaintiff, | COMPLAINT |
| 16          v. | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| 17   JUDY AZAR, TERRA NOVA ENTERPRISES, INC., STEPHEN SAMUEL, GOOD HEALTH, INC. dba | |
| 18   PREMIER PHARMACY SERVICES, CIENEGA PHARMACY, INC., | |
| 19   MEDQUICK PRESCRIPTION SHOPPE, INC., EMMANUEL LIM, | DEMAND FOR JURY TRIAL |
| 20   and ERL MEDICAL CORPORATION. | |
| 21          Defendants. | |
| 22 | |

23

24

25

26

27

28 _____
                    COMPLAINT

# I.     Preliminary Statement

1.     The centerpiece of this false claims act lawsuit is the biologic drug called intravenous immunoglobulin or "IVIG". IVIG, an antibody therapy derived from human plasma used to treat peripheral neuropathy, (often experienced as pain, numbness or tingling), is administered via infusion. It is exceedingly expensive, and government reimbursement for the drug is easily tens of thousands per year for a single patient. At one time it was common practice for physicians to prescribe IVIG to HIV/AIDS patients suffering from chronic inflammatory demyelinating polyneuropathy or as it is often referred to, "CIDP". Both federal and state funded health insurance programs reimburse for IVIG and for administration of the infusion. The defendants in this case decided to fraudulently enrich themselves by means of falsified prescriptions for IVIG and IVIG infusions at the expense of the federal and state government. As a consequence, the United States and the State of California have suffered many millions of dollars in damages, taxpayer dollars that defendants essentially stole from the government and which could, and should, have been used to provide necessary and appropriate medical care to actual patients.

2.     The first step in Defendants' multi-faceted scheme was generating false IVIG prescriptions. Defendant Judy Azar, previously employed full time as a medical assistant by the Relator, (a physician and nationally recognized HIV specialist), created fake IVIG prescriptions and fake prior approval letters for years, even falsifying Relator's signature. Next, she transferred these prescriptions to one of the defendant specialty pharmacies, Good Health, Inc. (hereinafter "Premier Pharmacy"), Cienega Pharmacy, Inc., or MedQuick Prescription Shoppe, Inc. which submitted them to the federal government (CMS) or state government (Medi-Cal) for reimbursement. In so doing these pharmacies, which had every reason to know these prescriptions were fake, profited in multiple respects. First, when they submitted claims for drug reimbursement by the government they

COMPLAINT

1

1   profited by the difference between the price they would have paid for the drug in
2   the commercial market, and the reimbursement amount they received from the
3   government for the drug. Second, they profited by submitting false claims for
4   reimbursement for infusion sessions which never actually took place. Third, since
5   the prescriptions were fictitious, they very well opted not to even buy the IVIG in
6   the commercial market. Instead, they simply submitted false claims for government
7   reimbursement using the fake prescriptions and pocketed the entire reimbursement.
8       3.      Liability under the federal and California false claims acts also
9   attaches to these fake claims because they are the direct consequence of unlawful
10  kickbacks. The relationship between Judy Azar/ Terra Nova Enterprises, Inc. and
11  the specialty pharmacies was conspiratorial. In exchange for receiving supplies of
12  fraudulent IVIG prescriptions (which the pharmacies proceeded to submit for
13  reimbursement), the pharmacies agreed to, and did, pay Azar generous kickbacks.
14  These payments not only violated the federal and California anti-kickback statutes,
15  they simultaneously tainted and rendered materially false all claims for
16  reimbursement derived therefrom. These kickbacks took the form of so-called
17  payment for Judy Azar's administration of infusions of IVIG. Defendant Premier
18  Pharmacy, for example, paid her as a full-time employee for years. But Relator's
19  investigation reveals that these infusions never occurred and in any event, as a
20  medical assistant, Judy Azar could not legally administer drug infusions in
21  California. To provide cover for payment of these kickbacks, Judy Azar created
22  fake invoices for her infusion services and falsely represented that she was a
23  registered nurse.
24      4.      Relator's investigation also indicates that the specialty pharmacies
25  purchased IVIG in connection with the execution of this fraud on the government,
26  and that some of what was acquired made its way to Judy Azar / Terra Nova
27  Enterprises, Inc., who then sold the drug on the black market at a large discount off
28

COMPLAINT

2

commercially available prices. Defendants Dr. Emanuel Lim and the company he heads, ERL Medical Corporation, purchased large quantities of heavily discounted IVIG from Azar for years, despite being presented with ample red flags warning that these unregulated purchases of drug from a medical assistant were squarely illegal. The patient's insurer, which upon information and belief was often CMS or Medi-Cal, then reimbursed Lim for the drug. The "spread" between what Lim paid for the drug and the amount by which he was reimbursed was fraudulently inflated because he acquired the black market IVIG so cheaply.

5.    As between the three pharmacy defendants, the unlawful actions of defendant Premier Pharmacy were particularly egregious. Numbers help to tell the story. Invoices show that over the course of at least five years, Azar billed, and Premier Pharmacy paid $17,570.00 for 74 infusion sessions. Furthermore, Azar prepared and then transmitted to Premier Pharmacy at least 38 forged progress notes for use in providing cover for their fraudulent scheme.

## II.    Jurisdiction and Venue

6.    This Court has jurisdiction under 31 U.S.C. §§ 3730 *et seq.* and 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over Defendants because they reside or transact business in this District or committed the proscribed acts in this District.

7.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a) because at least one Defendant may be found, resides, and transacts business in this District, and many of the acts complained of took place in this District.

## III.    Parties

### A.    Plaintiffs

8.    The United States of America is a real party in interest to the claims of this action.

---

COMPLAINT

3

9.     The United States brings these claims on its behalf and on behalf of the Centers for Medicare and Medicaid Services ("CMS"), the Defense Health Agency as administrator of TRICARE, the Veterans Health Administration as administrator of VA health care benefits, the Office of Personnel Management as administrator of the Federal Employee Health Benefits Program, and the Federal Employees Compensation Plan.

10.     The State of California is a real party in interest to claims alleged in this action. California administers its Medicaid program known as Medi-Cal through the Department of Health Care Services.

11.     The Relator is Dr. Anthony Mills ("Dr. Mills" or "Relator Mills"), an individual residing in California. Dr. Mills is the President of Southern California Men's Medical Group ("SoCal Men's Medical Group" or the "Medical Group"), 9201 Sunset Blvd #812, Los Angeles, CA. Additionally, he is the clinical research director of an affiliated entity, Mills Clinical Research and the CEO of a second affiliated entity, the Men's Health Foundation. Relator Mills is also a member of the Clinical Medicine Faculty of the University of California at Los Angeles. Relator Mills is a leading clinician in the fields of men's health and HIV treatment. He is a member of the Infectious Disease Society of America, the HIV Medical Association, International AIDs Society, IAS-USA and the American Academy of HIV Medicine. Dr. Mills received his B.A. and M.D. degrees from Duke University.

**B.     Defendants**

12.     Defendant Judy Azar ("Azar") is an individual residing in California. During the time period covered by this Complaint, Ms. Azar was employed by SoCal Men's Medical Group as a medical assistant. Her responsibilities included drawing blood, taking vital signs, administering intermuscular injections and escorting patients. Relator terminated Azar's employment with SoCal Men's

1    Medical Group on or about April 8, 2019 in the wake of learning of the fraud
2    alleged herein.
3        13.    Defendant Terra Nova Enterprises, Inc. ("Terra Nova") is a suspended
4    corporation that was incorporated in California in 2007 and headquartered at 26507
5    Tahoe Drive, Valencia, CA 91354. Azar founded Terra Nova with Christopher
6    Morton (upon information and belief her boyfriend), and then proceeded to use it as
7    a front for conducting her illegal activities. Because Azar created and utilized Terra
8    Nova to assist in executing and concealing the fraud, and upon information and
9    belief this was its sole, or primary purpose, all references to Azar herein also
10   include Terra Nova.
11       14.    Defendant Stephen Samuel is an individual residing in California and
12   has been the CEO of Good Health, Inc. at all times relevant to this Complaint. Mr.
13   Samuel is also an attorney and maintains an active license under the State Bar of
14   California. His license number is 227507.
15       15.    Defendant Good Health, Inc. dba Premier Pharmacy Services
16   ("Premier Pharmacy") is a long-term care and specialty pharmacy serving patients
17   nationwide, including HIV/AIDS patients. Premier Pharmacy's primary distribution
18   center is located in California, with additional locations in Arizona, Texas,
19   Missouri, Pennsylvania, and New Jersey. Premier Pharmacy was incorporated in
20   California and is headquartered at 410 Cloverleaf Drive, Baldwin Park, CA 91706.
21   According to a recent Los Angeles Business Journal article, Premier Pharmacy is
22   licensed in all 50 states and has approximately 300 employees. Premier Pharmacy's
23   National Provider Identifier number and its California Medi-Cal number is
24   #1053486795.
25       16.    Defendant Cienega Pharmacy, Inc. ("Cienega Pharmacy") is a full-
26   service pharmacy specializing in patients being treated for HIV/AIDS. Cienega
27
28

1  Pharmacy was incorporated in California and is headquartered at 7360 Santa
2  Monica Boulevard, Suite 101, West Hollywood, CA 90046.
3      17.    Defendant MedQuick Prescription Shoppe, Inc. ("MedQuick") is a
4  specialty pharmacy providing services to patients with complex chronic diseases,
5  including HIV/AIDS. MedQuick was incorporated in California and is
6  headquartered at 546 W. Las Tunas Drive, San Gabriel, CA 91776.
7      18.    Defendant Emmanuel Lim is an individual residing in California and is
8  the President of ERL Medical Corporation. Dr. Lim specializes in the field of
9  HIV/AIDS treatment. Lim's NPI number is #1275514234.
10     19.    Defendant ERL Medical Corporation, dba Lim-Keith Multispecialty
11 Clinic Inc., ("ERL"), is a corporation that was incorporated in California and is
12 headquartered at 6200 Wilshire Boulevard, Suite 1510, Los Angeles, CA 90048.
13 ERL's NPI number is #1982760500.

## IV.    Legal Framework

### A.    The Federal False Claims Act

16     20.    The False Claims Act ("FCA") provides in pertinent part that any
17 person who:

18     (A) knowingly presents, or causes to be presented, a false or
19         fraudulent claim for payment or approval; [or]
20     (B) knowingly makes, uses, or causes to be made or used, a false
21         record or statement material to a false or fraudulent claim … [or]
22     (C) conspires to commit a violation of subparagraph (A), (B), (D),
23         (E), (F), or (G);
24                                    ***
25     (G) knowingly makes, uses, or causes to be made or used, a false
26         record or statement material to an obligation to pay or transmit
27         money or property to the Government, or knowingly conceals or

1          knowingly and improperly avoids or decreases an obligation to

2          pay or transmit money or property to the Government,

3      is liable to the United States Government [for treble damages and

4      such penalties as are allowed by law].

5  31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).

6      21.    The FCA further provides that "knowing" and "knowingly"

7      (A) mean that a person, with respect to information-

8          (i)    has actual knowledge of the information;

9          (ii)   acts in deliberate ignorance of the truth or falsity of the

10              information; or

11          (iii)  acts in reckless disregard of the truth or falsity of the

12              information; and

13      (B) requires no proof of specific intent to defraud[.]

14  31 U.S.C. § 3729(b)(1).

15      22.    Section 3729(a)(1) of the FCA provides that a person is liable to the

16  United States Government for three times the amount of damages that the

17  Government sustains because of the act of that person, plus a civil penalty of

18  $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation

19  Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of

20  1996, 28 U.S.C. § 2461 (notes), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. §

21  85.3 (2015), the FCA civil penalties were adjusted to $5,500 to $11,000 per

22  violation for violations occurring on or after October 23, 1996. In accordance with

23  the Federal Civil Penalties Inflation Adjustment Act of 2015, the FCA civil penalty

24  amounts were again adjusted, this time to $10,781 to $21,563 per violation for

25  violations occurring after November 2, 2015. *See* 28 C.F.R. §§ 85.3 & 85.5 (2016);

26  81 Fed. Reg. 42491, 42500 (2016).

27

28

23.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

***FCA Liability Arising from the Failure to Return Overpayments***

24.     The term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

25.     Congress enacted the Affordable Care Act on March 23, 2010. Section 6402(a) of the ACA established a new Section of the Social Security Act (which provides for Medicare and Medicaid), 42 U.S.C. § 1320a–7k, called the Medicare and Medicaid program integrity provisions (the "Integrity Provisions").

26.     The overriding purpose of the Integrity Provisions is to protect government funds dedicated for healthcare purposes from fraud and improper payments. This is accomplished by way of a statutory framework for determining when "overpayments" are received by providers and when the retention of such overpayments creates liability under the False Claims Act.

27.     The Integrity Provisions require a person who has received an overpayment to "report and return the overpayment to the Secretary [of CMS], the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address," and to "notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment." 42 U.S.C. § 1320a-7k(d)(1)(A)-(B).

28.     The law further requires that an overpayment be reported and returned by the later of: (A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable. 42 U.S.C. § 1320a-7k(d)(2)(A)-(B).

29.     The Integrity Provisions specify that any overpayment retained by a person after the deadline for reporting and returning an overpayment is an obligation (as defined in 31 U.S.C. 3729(b)(3)) for purposes of the federal False Claims Act. 42 U.S.C. § 1320a-7k(d)(3).

30.     The Integrity Provisions define the term "overpayment" as "any funds that a person receives or retains under subchapter XVIII or XIX [Medicare/Medicaid] to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B).

31.     The terms "knowing" and "knowingly" as used in the Integrity Provisions have the same definitions as under the federal False Claims Act. 42 U.S.C. § 1320a-7k(d)(4)(A).

32.     The term "person" as used in the Integrity Provisions means "a provider of services, supplier, Medicaid managed care organization [MCO] (as defined in section 1396b(m)(1)(A) of this title), Medicare Advantage [MA] organization (as defined in section 1395w-151(a)(13) of this title) or PDP [prescription drug plan] sponsor (as defined in section 1395w-151(a)(13) of this title). 42 U.S.C. § 1320a-7k(d)(4)(C)(i)."

**B.     The California False Claims Act**

33.     The California False Claims Act ("CFCA") provides in pertinent part that any person who:

(1)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval,

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim,

(3)     Conspires to commit a violation of this subdivision,

\*\*\*

(7)     Knowingly makes, uses, or causes to be made or used a false

record or statement material to an obligation to pay or transmit

money or property to the state or to any political subdivision, or

knowingly conceals or knowingly and improperly avoids, or

decreases an obligation to pay or transmit money or property to

the state or to any political subdivision,

(8)     Is a beneficiary of an inadvertent submission of a false claim,

subsequently discovers the falsity of the claim, and fails to

disclose the false claim to the state or the political subdivision

within a reasonable time after discovery of the false claim, shall

be liable to the state or to the political subdivision for treble

damages, the costs of bringing the civil action and statutory

penalties.

Cal. Gov't Code § 12651(a).

**C.     The Federal Anti-Kickback Statute And FCA Violations Arising From Violations Thereof**

34.     The primary purpose of the Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), is to protect patients and the federal health care programs from the corruptive influence of kickbacks and bribes on treatment decisions. The Medicare and Medicaid programs rely upon physicians to provide treatment that is medically necessary and appropriate.

35.     To protect patients and the government health care programs from medically unnecessary treatment, treatment of inferior quality, and harmful treatment, Congress enacted the Federal AKS in 1972, barring the payment of kickbacks to physicians. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) & (c). Congress subsequently strengthened the statute in 1977 and again in 1987 to ensure that kickbacks disguised as legitimate transactions do not

1    evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

2    No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub.

3    L. No. 100-93. Additionally, the AKS was "intended to strengthen the capability of

4    the Government to detect, prosecute, and punish fraudulent activities under the

5    [M]edicare and [M]edicaid programs, . . . because fraud and abuse among

6    practitioners . . . is relatively difficult to prove and correct.'" *U.S. ex rel. Bawduniak*

7    *v. Biogen IDEC*, Civ. No.12-10601, 2018 WL 1996829, *2 (D. Mass. Apr. 27,

8    2018) (quoting H.R. Rep. No. 95-393, at 1, 27 (1977)).

9         36.    Violation of the Federal AKS is a felony punishable by fines and

10   imprisonment and can also result in exclusion from participation in federal health

11   care programs. *See* 42 U.S.C. §§ 1320a-7b(b)(2) & (7).

12        37.    Specifically, the Federal AKS makes it illegal for individuals or

13   entities to "knowingly and willfully offer[] or pay[] remuneration (including any

14   kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in

15   kind to any person to induce such person . . . to purchase, . . . order, . . . or

16   recommend purchasing . . . or ordering any good . . . service or item for which

17   payment may be made in whole or in part under a Federal health care program." 42

18   U.S.C. § 1320a-7b(b)(2).

19        38.    California has also enacted an anti-kickback law prohibiting the

20   payment or acceptance of kickbacks by any person in connection with the purchase

21   or ordering of goods or the provision of any services covered by their Medi-Cal

22   Program. *See* Cal. Welf. & Inst. Code § 14107.2.

23        39.    To be eligible to participate in the Medicare program and be

24   reimbursed for treatment provided to Medicare beneficiaries, providers are required

25   to enter into a provider agreement in which the provider makes the following

26   certification:

27

28

---

1  I agree to abide by the Medicare laws, regulations and program
2  instructions that apply to this supplier. The Medicare laws, regulations,
3  and program instructions are available through the Medicare
4  contractor. I understand that payment of a claim by Medicare is
5  conditioned upon the claim and the underlying transaction complying
6  with such laws, regulations, and program instructions (including, but
7  not limited to, the Federal anti-kickback statute and the Stark law), and
8  on the supplier's compliance with all applicable conditions of
9  participation in Medicare.
10  Medicare Enrollment Application (CMS-855B).
11      40.    Likewise, providers participating in the Medicaid program are required
12  to sign enrollment agreements with the states. Although there are variations in each
13  state's Medicaid provider agreement, all of these agreements require that the
14  provider comply with all state and federal laws, including the State AKS, Federal
15  AKS, and Medicaid regulations, in billing the state Medicaid program for drugs and
16  services furnished to Medicaid beneficiaries.
17      41.    On each Form CMS-1500 submitted to Medicare or Medicaid for
18  payment for drugs and services furnished to beneficiaries, a provider certifies,
19  among things, that the claim "complies with all applicable Medicare and/or
20  Medicaid laws, regulations, and program instructions for payment including but not
21  limited to the Federal anti-kickback statute":
22  In submitting this claim for payment from federal funds, I certify that:
23  1) the information on this form is true, accurate and complete; 2) I
24  have familiarized myself with all applicable laws, regulations, and
25  program instructions, which are available from the Medicare
26  contractor; ... 4) this claim, whether submitted by me or on my behalf
27  by my designated billing company, complies with all applicable
28

COMPLAINT
12

Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE ...

42.    Accordingly, compliance with the Federal AKS is a material condition of payment for Medicare and Medicaid claims. Similarly, compliance with the Federal AKS and California AKS are material conditions of payment for Medicaid claims. Claims for payment for drugs and services that are tainted by illegal kickbacks are not authorized to be paid by Medicare and Medicaid and thus constitute claims that are both legally and factually false.

43.    Section (g) of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, specifically provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the Federal FCA]." Congress added section (g) to the Federal AKS in 2010 to clarify that "all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted by the wrongdoers themselves." 155 Cong. Rec. S10854 (Oct. 28, 2009) (Sen. Leahy). Another goal of the amendment was to "strengthen[] whistleblower actions based on medical care kickbacks, which tempt by health care providers to churn unnecessary medical care at great risk to patients and great cost to the taxpayer." *Id.* at S10853 (Sen. Kaufman).

**D.**     **Government Healthcare Program Coverage for Prescription HIV Drugs**

      **1.**     **Medicare Coverage Of Prescription HIV Drugs**

44.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. See 42 U.S.C. §§ 426 & 426a.

45.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services and services for patients with end-stage renal disease.

46.     Medicare Part B-covered drugs generally fall into the following categories: drugs furnished incident to a physician's services (*e.g.*, injectable drugs used in connection with the treatment of cancer); drugs explicitly covered by statute (*e.g.*, some vaccines and oral anticancer drugs); and drugs used in conjunction with durable medical equipment such as inhalation drugs or infusion drugs such as IVIG. *See* Medicare Benefit Policy Manual, ch. 15 § 50; *see also* 42 U.S.C. § 1395x(t)(2)(B).

47.     The Part B reimbursement amount is generally determined by reference to the drug's Average Sales Price ("ASP"), a price which the government calculates based on quarterly price information that the drug manufacturer provides to CMS. Since January 2005, CMS has been paying for most Part B-covered drugs using a payment methodology based on ASP. ASP is defined as a manufacturer's sales of a drug to all purchasers in the United States in a calendar quarter divided by the total number of units of the drug sold by the manufacturer in that same quarter. The Part B reimbursement amount for a particular drug is generally the ASP plus 6%. Medicare pays 80% of this amount and the patient is responsible for the remaining 20%, which for qualifying patients is reimbursed by Medicaid.

48.     At all relevant times, IVIG was reimbursable under Medicare Part B.

49.    Medicare Part C provides for private companies to offer "Medicare Advantage" plans that include, at a minimum, all benefits covered by Parts A and B. Accordingly, at all relevant times, IVIG was reimbursable under Medicare Part C.

50.    Medicare Part D provides coverage for certain prescription drugs. Medicare Part D Plans are offered by private, Medicare-approved insurance companies which are funded by the federal government. In order to be covered by Part D, the drugs generally must be dispensed only upon a prescription and for a medically-acceptable indication. *See* Medicare Prescription Drug Benefit Manual, ch. 6 § 10.1. At all relevant times, IVIG was reimbursable under Medicare Part D.

51.    Medicare Part C Plans and Part D Plans are "grantees" of federal funds under the federal FCA. 31 U.S.C. § 3729(b)(2)(A)(ii). Therefore, when false claims for payment are knowingly submitted to a Medicare Part C or D Plan, this gives rise to liability under the federal False Claims Act.

**2.    Medi-Cal Coverage Of Prescription HIV Drugs**

52.    Medicaid is a government health insurance program for the poor that is jointly funded by the federal and state governments. See 42 U.S.C. §§ 1396 *et seq.*

53.    Each state administers its own Medicaid program. California's Medicaid Program is referred to as Medi-Cal. Medicaid programs are governed in part by federal statutes, regulations and guidelines. The federal portion of each state's Medicaid payment – the Federal Medical Assistance Percentage ("FMAP") – is based on that state's per capita income compared to the national average. California's Medi-Cal FMAP is presently 50%.

54.    Medi-Cal will generally cover beneficiaries' Medicare co-payments.

55.    Outpatient prescription drug coverage is an optional benefit, though one that all state Medicaid programs have elected to provide. *See* §1905(a)(12) of the Social Security Act including Medi-Cal. Outpatient prescription drugs are

1  typically those that may be obtained only by prescription and dispensed by

2  pharmacists. IVIG was a covered drug under Medi-Cal.

3      56.    States pay for covered drugs at prices set by various formulas relating

4  to the cost of those drugs and the pharmacies' costs in dispensing them. Medicaid

5  allows states some level of discretion in choosing this formula. Under California's

6  Medicaid Program, Medi-Cal has reimbursed for IVIG utilizing a methodology

7  intended to reflect the actual commercial price of the drug.

8      57.    The State of California is a "grantee" of federal funds under the federal

9  FCA. 31 U.S.C. § 3729(b)(2)(A)(ii). Therefore, when false claims for payment are

10  knowingly submitted to Medi-Cal, this gives rise to liability under not only the

11  California CFCA but the federal False Claims Act as well.

12  **3.    The Ryan White CARE Act**

13      58.    The Ryan White Comprehensive AIDS Resources Emergency (CARE)

14  Act is the third largest source of federal funding for HIV care in the United States,

15  following Medicare and Medicaid, and is the country's single largest federal

16  program designed specifically for people with HIV. The program functions as a

17  "payer of last resort" for those facing coverage limits or with no other source of

18  coverage. The program provides primary health care, support services, and

19  pharmaceutical treatments—including IVIG—to individuals affected by HIV.

20      59.    The Ryan White CARE Act was first enacted in 1990 and has been

21  amended and reauthorized four times, in 1996, 2000, 2006, and 2009. The Ryan

22  White CARE Act expired in 2013, but the program remains in effect as Congress

23  continues to appropriate funding each year. The program's federal funding for

24  fiscal year 2019 was approximately $2.3 billion.

25      60.    The Ryan White program is divided into five parts. Part A provides

26  funds for "eligible metropolitan areas," while Part B provides funds to states and

27  territories. Much of the funding provided to states and metropolitan areas under

28

COMPLAINT

16

1   Parts A and B is channeled in turn to local providers. In contrast, Parts C, D, and F

2   of the program provide funds directly to organizations providing HIV care.

3       61.     The vast majority of funding provided under the Ryan White program

4   is concentrated in Parts A and B. Part A represented 28% of the Program's funding

5   in FY 2019, with the Los Angeles metropolitan area's share being $43.9 million.

6   Meanwhile 57% of the Program's funding was provided to states under Part B, with

7   California receiving $156.4 million.

8       62.     Recipients of funding under the Ryan White program are "grantees" of

9   federal funds under the federal FCA. 31 U.S.C. § 3729(b)(2)(A)(ii). Therefore,

10   when false claims are knowingly submitted for payment by funds provided under

11   the Ryan White program, this gives rise to liability under the federal False Claims

12   Act.

13                          **V.     IVIG Background**

14       63.     Immunoglobulins are large antibodies that are used by the immune

15   system to identify and neutralize foreign objects such as bacteria and viruses.[1]

16   Beginning in the 1950s, immunoglobulins were introduced as treatment options for

17   patients with antibody immune deficiencies.[2] Over the course of decades, scientific

18   innovation led to the creation of immunoglobulin products that could be used

19   intravenously.[3] When administered to a patient through a vein, these medicines are

20   called Intravenous Immunoglobulin, or IVIG.[4] When done safely, the process of

21   administering IVIG to a patient often takes multiple hours.[5] In California, Medical

22   Assistants are not authorized to administer medications intravenously.[6]

23   _____

24   [1] https://www.ajmc.com/journals/supplement/2012/a390_12jun_igg/considerations-for-the-optimal-use-of-immunoglobulin

25   [2] https://primaryimmune.org/sites/default/files/publications/IDF%20Guide%20to%20Ig%20Therapy.pdf
     [3] https://primaryimmune.org/sites/default/files/publications/IDF%20Guide%20to%20Ig%20Therapy.pdf

26   [4] https://www.uptodate.com/contents/intravenous-immune-globulin-ivig-beyond-the-basics
     [5] https://www.pfizerpro.com/sites/default/files/otg-octagam-dosing-and-administration-guide.pdf?advert=advert;
     https://primaryimmune.org/sites/default/files/publications/Ig%20Chart%206-4-2019.pdf

27   [6] https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publication-pdf/2013_09_California_MA_Scope_of_Practice.pdf; *see* 16 CFR § 1366 *et seq.*

28                          COMPLAINT

                            17

1    64.    IVIG is created through a purification process that begins with the

2    plasma of human blood donors. This means that IVIG stores cannot be replenished

3    simply by purchasing more precursor ingredients, as would be the case for a typical

4    chemically manufactured drug.[7] Because of this reliance on human donors, IVIG

5    shortages are common, and have become increasingly so in recent years.[8] Due to

6    limited IVIG availability, hospitals and medical systems have been forced to delay

7    treatments, lower doses, and prioritize certain patients while leaving others

8    untreated.

9    65.    IVIG is used in antibody replacement therapy for patients with

10   immunodeficiencies who do not naturally produce sufficient amounts of antibodies

11   or whose antibodies function incorrectly.[9] Additionally, due to immunoglobulin's

12   anti-inflammatory and immunomodulatory effects, IVIG is used to treat patients

13   with peripheral neuropathies[10] such as Guillain-Barré Syndrome and its chronic

14   counterpart known as chronic inflammatory demyelinating polyneuropathy, or

15   CIDP.[11] Symptoms of CIDP include tingling or numbness in the toes and fingers;

16   weakness in the arms and legs; aching muscle pain; loss of deep tendon reflexes;

17   and abnormal sensation.[12]

18   66.    It is estimated that over one-third of HIV/AIDS patients experience

19   peripheral neuropathy.[13] Although the pathogenesis of HIV/AIDS-associated

20   peripheral neuropathy was not fully understood, at least two causal pathways have

21   been recognized: neuropathy caused by HIV itself, and neuropathy caused by HIV

---

[7] https://www.rheumaderm-society.org/ivig/
[8] https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/information-about-immune-globulin-human-product-shortage
[9] https://primaryimmune.org/wp-content/uploads/2015/11/IDF-Guide-for-Nurses-2013.pdf
[10] http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/inflammatory/cidp.shtml
[11] https://www.ncbi.nlm.nih.gov/pubmed/16391402; https://www.aan.com/PressRoom/Home/PressRelease/1051
[12] http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/inflammatory/cidp.shtml
[13] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3962261/

COMPLAINT

18

treatments.[14] When caused by treatments, the most common culprits are nucleoside reverse transcriptase inhibitors, known as NRTIs or "d-drugs."[15] In turn, IVIG is among the treatments available to treat the neuropathy caused by the NRTIs.[16]

67.     In the beginning stages of the HIV/AIDS epidemic, NRTIs were used in high doses, and sometimes as monotherapy, leading to heightened incidence of drug-related neuropathy. However, the incidence of drug-related neuropathy has decreased dramatically in recent years, as NRTIs have been employed in lower doses or as part of a combination regimen—leading, in turn, to far less need for IVIG to treat resulting neuropathy.[17] This drop in IVIG utilization is reflected in the HIV patients treated by SoCal Men's Health Group. SoCal Men's Health Group presently cares for roughly 2,500 HIV patients. The cohort receiving NRTIs is either very small or even non-existent.

68.     Treatment with IVIG is extremely expensive. As a representative example, the reimbursement for .5g of the IVIG Octogam is currently $43.14 in the case of Medi-Cal and approximately $38.22 in the case of Medicare.[18] Assuming a patient weighs 84kg, (about 185 lbs), a typical dosage would be 42 grams, resulting in well over $3000 in reimbursement exclusive of reimbursement for the infusion itself. IVIG infusions are often administered every day for five days.

69.     IVIG infusions can result in adverse effects, some of which are extremely dangerous. These risks include hypertension, anaphylaxis, bronchospasm, and altered consciousness. These adverse effects require the

---

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3962261/; https://www.foundationforpn.org/what-is-peripheral-neuropathy/causes/inflammatory-neuropathy/hiv-aids/
[15] https://www.foundationforpn.org/what-is-peripheral-neuropathy/causes/inflammatory-neuropathy/hiv-aids/; http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/inflammatory/hiv_aids.shtml
[16] https://www.foundationforpn.org/what-is-peripheral-neuropathy/treatments/
[17] https://www.thebodypro.com/article/peripheral-neuropathy
[18] https://files.medi-cal.ca.gov/pubsdoco/rates/rates_information.asp?num=23&first=A0030&last=L3253; https://hcpcs.codes/j-codes/J1568/

1  infusion to be stopped immediately and for corresponding medical attention to be

2  provided.

3       70.     Among the drug companies selling IVIG during the relevant time

4  period, and the respective name of their IVIG brand are: Pfizer (brand name

5  Octogam), Grifols (Flebogamma, Gamunex-C), CSL Behring (Privigen), Kedrion

6  (Gammaked), Bio Products Laboratory (Gammplex), and Shire (Gammagard).

7                    **VI.    Factual Allegations**

8  **A.    Relator Mills Learns Of Potential Fraud Concerning IVIG Prescriptions**

9         **From The Medical Board Of California**

10       71.     SoCal Men's Medical Group, established in 1999, specializes in

11  treating cardiovascular disease, diabetes, infectious diseases such as hepatitis as

12  well as HIV treatment and prevention and sexual health. An affiliated entity is the

13  Men's Health Foundation Pharmacy ("Foundation Pharmacy"] which is a non-

14  profit pharmacy and located in the same building as SoCal Men's Medical Group.

15  At no time has this pharmacy stocked or sold IVIG.

16       72.     The Medical Group had an ongoing relationship with Premier

17  Pharmacy. In particular, at all times relevant hereto a moratorium on new pharmacy

18  contracts with Medi-Cal was in effect (at least in part because of the amount of

19  fraud surrounding drug prescriptions being directed to Medi-Cal for payment). This

20  meant that the Foundation Pharmacy could not fill prescriptions being paid by

21  Medi-Cal. Accordingly, the Medical Group regularly directed Medi-Cal patients to

22  Premier Pharmacy. Medi-Cal patients were directed to Premier Pharmacy in

23  particular because it offered free delivery and accepted co-pay assistance.

24       73.     In early December of 2018 Relator Mills received a telephone call at

25  the Medical Group from an investigator, Sylvia Salcedo, calling in connection with

26  an investigation being undertaken on behalf of the Medical Board of California

27  ("Medical Board"). Ms. Salcedo told Relator Mills that the Medical Board was

28  

COMPLAINT
20

1   investigating sales of IVIG to Dr. Emmanuel Lim (of the ERL Medical Corporation

2   located in Los Angeles) and his unusually high use of IVIG with his HIV patients.

3   Relator Mills told her that he would be suspicious of any provider still prescribing

4   regular IVIG infusions with HIV patients.

5        74.    Ms. Salcedo also told Relator Mills that Dr. Lim had reported to the

6   Medical Board that he was purchasing his IVIG from Dr. Mills. Relator Mills

7   requested that Ms. Salcedo provide the Medical Group with a sample invoice.

8        75.    On December 4, 2018, Salcedo emailed a copy of a sample invoice

9   which purports to represent a sale to ERL Medical Corporation on April 25, 2018,

10   by "Anthony Mills, MD", at the Medical Group business address, of 150 units

11   (grams) of IVIG at a price of 40 dollars per gram, for a total of 6,000.00 dollars.

12   The invoice is fraudulent. No such transaction with Relator Mills ever occurred.

13   Moreover, the per unit price appeared heavily discounted off the expected

14   commercial price.

15        76.    Relator Mills followed up by asking the Medical Board who the

16   contact person was for the "sale" described in the invoice. Salcedo told him that

17   defendant Azar was the contact person and that she had evidently been selling IVIG

18   to ERL Medical Corporation for years.

19        77.    Relator Mills then asked Defendant Azar directly if she had played any

20   role in selling IVIG to ERL Medical Corporation. She denied knowing anything

21   about such sales and said that she would look into the matter further. Azar never

22   provided any follow up information.

23   **B.    Relator Mills Undertakes An Investigation Within SoCal Men's Medical**

24   **       Group Of The Contents Of Defendant Azar's Computer**

25        78.    In February of 2019 SoCal hired a new nurse manager, Brian Willis,

26   who assumed responsibility for purchasing supplies. He soon learned that Azar had

27   been ordering extra IV supplies despite the limited use of IV's at the clinic.

28

COMPLAINT

21

1     Furthermore, during early 2019 there were rumors circulating within the medical

2     Group that Azar might be operating a home health agency of some sort providing

3     IV infusions. An Internet search identified a listing for "Azar Judy Nursing

4     Agency" at 5901 W. Olympic Boulevard, #420 Los Angeles, CA 90036, with a

5     phone number of (310) 246-2270. A search for that phone number, in turn, revealed

6     that it belonged to a company called Terra Nova Medical Group, with the Better

7     Business Bureau listing an address of 9201 W. Sunset Blvd. # 414—the same

8     building as the SoCal Men's Medical Group.

9         79.     These disturbing revelations prompted Relator Mills to initiate an

10    internal investigation to determine whether defendant Azar had been engaged in

11    illegally selling or administering IVIG. Accordingly, the Medical Group's IT

12    department undertook the retrieval of information contained in Azar's computer,

13    including files she had downloaded from her personal email.

14         80.     The IT investigation produced an array of documents and data

15    revealing multiple highly troubling facts regarding Azar's activities with respect to

16    sales and administration of IVIG, and indicating that she was: 1) engaged in

17    falsifying prescriptions for IVIG which were being directed to and filled by Premier

18    Pharmacy, 2) falsely representing in invoices to Premier Pharmacy that she was

19    administering infusions of IVIG, 3) falsely representing herself as a registered nurse

20    and 4) being paid by Premier Pharmacy for administering these infusions on a full

21    time (40-hour week) basis, and moreover, for days and hours when she was

22    physically present at the Medical Group.

23         81.     Among the more surprising and highly disturbing revelations:

24         a.     Azar had been submitting work invoices to Premier Pharmacy as

25    essentially a full-time employee for at least five years from as early as February

26    2014.

27

28

b.     The invoices appeared to be for infusion services administered by Azar to medical patients, roughly three times per week per patient, at a rate of $35 per hour for 6-8 hours per day.

c.     Many of the invoices not only included dates of service but patient names. A minimum of 74 total entries identified just two patients. Fifty-three of the infusion sessions, or 71.6 percent, were attributed to patient A and twenty-one sessions, or 28.4 percent, to patient B. Patient A is not a patient of Dr. Mills and while patient B is a patient of Dr. Mills, Dr. Mills had never prescribed IVIG for Patient B.

d.     In these invoices Azar seeks compensation from defendant Premier Pharmacy on a full time or near full time basis on days and at times she was physically present at the Medical Group.

e.     In addition to these invoices, IT's investigation uncovered at least one IRS W-2 Form stating that Premier Pharmacy had paid over $62,000.00 in compensation to Defendant Azar in calendar year 2014, greater than her compensation at the Medical Group for the same year.

f.     IT's investigation also uncovered an earnings statement from Premier Pharmacy to Azar revealing that for the period from January 1, 2018 through the July 8th, 2018, Premier Pharmacy had paid Azar over $45,000.00. The statement includes "Time Card Details" showing that Azar was claiming she had clocked in every day at Premier Pharmacy at 8:00 a.m. and clocked out at 4:30 p.m.

g.     The investigation also uncovered abundant evidence that Azar had falsified prescriptions for IVIG which were subsequently transmitted to Premier Pharmacy for filling. For example, correspondence faxed to Premier Pharmacy's fax number on or about March 29, 2016 providing prior authorization for IVIG insurance coverage for Patient B purports to be signed by Relator Mills. Relator Mills never sought such prior authorization, however, and his signature is

1  fake. Also among Azar's documents, a refill authorization request for 12 refills for
2  this same patient from on or about November 7, 2016 was found (this refill request
3  is also proof that Premier Pharmacy was indeed filling these fraudulent
4  prescriptions). Relator Mills never sought these refills and his signature on the refill
5  request is fake – either Azar used a stamp signature or forged one for Relator Mills.
6  Yet a third document representing to be an IVIG prescription (with 5 refills) for
7  Patient B written by Relator Mills dated April 14, 2014 and faxed to Premier
8  Pharmacy at 2657 Saturn Street, Brea CA is fraudulent. Relator Mills neither wrote
9  nor signed this prescription. Another fraudulent prescription dated May 9, 2014
10  (one which actually indicates Azar spoke with Premier Pharmacy directly in regards
11  thereto) was uncovered. This prescription, purportedly signed by Relator Mills, was
12  faxed to Premier Pharmacy on or about that date for IVIG (with 5 refills) for Patient
13  B again.
14          h.      The investigation also uncovered an IRS Form 1099 stating that
15  in 2017 the ERL Medical Corporation had paid Anthony Mills MD $310,000.00.
16  Relator Mills never received such a payment.
17  **C.    Relator Mills Confronts Defendant Samuel, President of Premier**
18          **Pharmacy And Asks Him What He Knows About Azar And Fraudulent**
19          **IVIG Prescriptions Being Filled By Premier Pharmacy**
20          82.     In late March 2019, in the wake of the internal investigation, Relator
21  Mills contacted Stephen Samuel, the president of Premier Pharmacy by phone.
22  Relator Mills told Samuel that the California Medical Board had contacted him in
23  connection with a state investigation of Dr. Lim's suspiciously high usage of IVIG
24  and Defendant Azar's role in supplying IVIG to Dr. Lim. Relator Mills told Samuel
25  that the Medical Group had undertaken a search of Azar's documents and found
26  evidence indicating that she was engaged in falsifying IVIG prescriptions and
27  submitting them to Premier Pharmacy.
28

83.     Samuel sounded panicked by the information Relator Mills had just shared with him. Samuel responded that whenever he believed Azar had provided a "stamped" Anthony Mills signature he had insisted that Azar supply him with an original signature from Dr. Mills instead. He acknowledged the prescriptions were being filled. Indeed, he told Mills that sometimes the drug was delivered to the patient and other times it was delivered to Azar. (Personnel at the Medical Group confirmed to Mills that drugs were delivered directly to Azar at Medical Group's offices. Samuel added that some of the IVIG refill requests were prepared by "Guyler." Guyler Quintal is a pharmacy tech who had been dismissed by relator Mills for writing prescriptions for himself. Pharmacy techs are not legally permitted to write prescriptions for IVIG. Samuel told Relator Mills that he would undertake his own investigation as to Azar's activities.

84.     On or about March 28, 2019, in an apparent attempt to convince Relator Mills of the legality of Azar's activities, Samuel faxed to the Medical Group multiple examples of progress notes purporting to memorialize IVIG infusion sessions during which defendant Azar had administered the drug to HIV patients. However, as Relator Mills recognized upon examination, these progress notes raise more questions than they answer. Not only did they have numerous indicia of falsity, more generally, they suggested that these infusions sessions and supporting patient notes were fabricated in order to provide the patina of legitimacy to the generous "compensation" Premier Pharmacy was giving Azar, money which was in truth, nothing more than illegal kickbacks paid in exchange for the ongoing stream of phony IVIG prescriptions Azar had been falsifying and sending Premier Pharmacy, (and which Premier Pharmacy then filled), for years.

85.     Among the red flags contained within the progress notes:

    a.     Azar signs each one as a registered nurse, no doubt because medical assistants are not legally permitted to administer drug infusions in the State

1    of California. Premier Pharmacy had supposedly been paying Azar many tens of

2    thousands of dollars for years for her administration of IVIG infusions. The fact

3    that she was holding herself out as a RN was a foundational misrepresentation of

4    which Premier Pharmacy should have been aware. In fact, during Relator Mills'

5    phone call with Samuel, Samuel claimed Premier Pharmacy would never accept a

6    prescription for IVIG from a mere medical assistant such as Azar was. Thus,

7    Samuel knew perfectly well Azar was not an RN.

8               b.    Many of the progress notes were obvious forgeries because the

9    patients' vital signs numbers were always identical to those of the other notes and

10   the handwriting is identical. Azar had filled out one progress note and apparently

11   copied it, using it over and over again by simply changing the date to make it

12   appear as if she had actually administered the IVIG infusion on an ongoing basis.

13              c.    The blood pressure reading on many of the notes was 90/66.

14   This is dangerously low and would call for termination of the infusion session since

15   the patient might be experiencing anaphylaxis.

16              d.    The progress notes appeared to show that Azar was

17   administering IVIG infusions from 3 a.m. to 9 a.m. in the morning, or in other

18   words, in the middle of the night.

19   **D.   Relator Mills Confronts Defendant Lim, President of ERL Medical**

20   **      Corporation, And Asks Him What He Knows About Payments from**

21   **      ERL to "Anthony Mills MD" For Fraudulent IVIG Prescriptions**

22              86.    Relator Mills then contacted Emmanuel Lim by phone. In particular,

23   Relator Mills wanted to know if any checks from Lim or ERL to Relator Mills

24   existed above and beyond the $310,000 in checks evidenced by the Form 1099

25   found among Azar's documents. He told Lim not to pretend that he really believed

26   he was purchasing IVIG from Dr. Mills when he knew the IVIG was coming from

27   Azar.

28
_____
                          COMPLAINT

87.   Lim told Relator Mills that Azar always delivered the drug and that he had been purchasing IVIG from her (Dr. Mills) for four or five years.

88.   It is not credible that Dr. Lim, and his company ERL believed their purchases of IVIG from Azar complied with the law. Indeed, every relevant fact points to the conclusion that Lim knew full well that Azar was selling IVIG on the black market, but that he bought it anyway in order to benefit financially from the spread between the amount he was paying for the drug and the far greater dollar amount which Medi-Cal and/or federal programs would reimburse for the drug. Among these relevant facts are the following:

a.   In Relator's decades of experience as a clinician and HIV specialist, doctors never sell IVIG.

b.   Lim/ERL was purchasing the IVIG from Azar at prices far below prices in the commercial market. For example, he purchased 150 units (grams) of IVIG from Azar on April 25, 2018 at a price of $40 per unit. This is far below what the drug would have cost in the commercial market at that time. Commercial prices (plus 6%) are roughly the reimbursement amount Medicare Part B pays, for example.

c.   Although he was ostensibly purchasing the drug from Relator Mills in large quantities and for years and years, he never once had any interaction whatsoever with Relator Mills.

d.   Azar herself was a medical assistant, not a licensed pharmacist.

e.   Given the highly unorthodox circumstances under which Lim/ERL was purchasing the IVIG, wherein the contact person for years was neither a doctor nor a pharmacist, Lim/ERL had ample reason to suspect that the IVIG was either adulterated or misbranded in violation of federal and possibly state law.

89.     The $6,000 check representing Lim/ERL's April 25, 2018 illegal purchase of IVIG was drawn from Union Bank. Upon a request for assistance, an employee of that bank told Relator that the check had been deposited into an account at Wells Fargo bank. Continuing his investigation, Relator Mills then met with a representative of Wells Fargo Bank. The representative confirmed that Lim/ERL's checks were being deposited at Wells Fargo and denied that the payee was Anthony Mills MD but would not provide any additional information. The representative did, however, suggest the possibility of "check washing". Check washing is a term used to describe the illegal act of changing the name on a check, or the dollar amount, and then depositing it.

90.     Relator Mills lodged a complaint with the California Board of registered nursing on or about April 11, 2019 to report Azar's unlawful activities. The Board of Nursing could not discipline Azar because she is not actually a registered nurse so they forwarded the complaint to the Medical Board of California, which has jurisdiction over Medical Assistants. On or about May 9, the Medical Board confirmed receipt of the complaint.

E.     **Relator Mills' Internal Investigation Indicated That Defendant Azar Had Conspired With Two Additional Specialty Pharmacies To Submit False Claims For Reimbursement As To IVIG**

91.     In the course of examining Defendant Azar's documents as part of Relator Mills' internal investigation, Relator discovered invoices that Defendant Azar had prepared for two other specialty pharmacies, Cienega Pharmacy located in West Hollywood, California, and MedQuick Pharmacy located in San Gabriel. Both of these pharmacies provide prescription services for HIV/AIDS patients.

92.     The invoices are similar in content and format to those Azar prepared for Premier Pharmacy.

93.     The Cienega Pharmacy invoices total $1,500.00 and cover weeks during May and July in 2012. The patient identified is Patient B, a Patient whose name also appears on Azar's Premier Pharmacy invoices.

94.     The MedQuick Pharmacy Invoices total $19,645 and span the period from July 2011 through February 2013. Just as in the case of the Premier Pharmacy invoices, many entries for infusions allegedly administered identify Patient A or Patient B as the recipient.

95.     As in the case of Premier Pharmacy, Defendant Azar was employed on a full-time basis during the time periods represented by these invoices.

96.     As in the case of Premier Pharmacy, Cienega and MedQuick had very reason to know full well that as a medical assistant, and not an RN, it was a violation of California law to administer infusions.

97.     The unusual number of infusions which were administered to Patient A (53) and Patient B (21) over the course of months constitute an additional red flag signaling that these infusions never took place. Indeed, Patient B has been under the care of Relator Mills for all relevant times herein and Relator Mills never prescribed IVIG infusions for him. These patients' names were instead used by defendants to create the illusion that Azar was performing reasonable and necessary infusion services and being paid by these Defendants.

98.     It is more than reasonable to infer not only that these infusion sessions were fictitious but given Azar's parallel use of fictitious invoices with respect to defendant Premier Pharmacy, it appears that these invoices are in truth false statements intended to mask the kickbacks these pharmacies were illegally paying Azar to provide them with forged IVIG prescriptions.

F.     **Additional Scienter Allegations**

99.     The False Claims Act and its California analog require that a defendant engage in the proscribed conduct "knowingly" in order to be held liable. The FCA

COMPLAINT

29

1   specifically explains that "no proof of specific intent to defraud" is required to meet

2   the knowingly standard. 31 U.S.C. 3729(b). A person is defined as acting

3   knowingly with respect to information if the person (i) has actual knowledge of the

4   information; (ii) acts in deliberate ignorance of the truth or falsity of the

5   information; or (iii) acts in reckless disregard of the truth or falsity of the

6   information. The Defendants have each satisfied the standard required to be held

7   liable.

8                                   *Judy Azar and Terra Nova*

9          100.   As an architect and primary actor in this scheme to defraud the United

10   States, Judy Azar had full knowledge of her acts and their implications. The

11   animating purpose of her scheme was to cause false and fraudulent claims to be

12   presented to the United States for payment. Judy Azar did this knowingly through

13   her coordination with the other Defendants to seek reimbursement for IVIG supply

14   and administration. Ms. Azar knowingly and willfully solicited and received

15   remuneration from the other Defendants in exchange for her participation in the

16   scheme.

17         101.   Likewise, Judy Azar's use of false records or statements material to

18   the false or fraudulent claims was done knowingly. Ms. Azar had actual knowledge

19   that she was forging fraudulent prescriptions and creating fraudulent clinical

20   progress notes which were material to the United States' payment of claims for

21   IVIG supply and administration. She knowingly and willfully solicited and received

22   remuneration in exchange for these fraudulent prescriptions and clinical progress

23   notes.

24                             *Stephen Samuel and Premier Pharmacy*

25         102.   Stephen Samuel and his company, Premier Pharmacy, knowingly

26   participated in the fraudulent scheme described in this complaint. Mr. Samuel and

27   Premier Pharmacy had knowledge that the claims for reimbursement of IVIG that

28

1  they presented to the United States for payment were false or fraudulent, and that
2  they were using false records or statements material to false or fraudulent claims,
3  because they knew that the prescriptions underlying the claims were forgeries.

4      103.   Mr. Samuel and Premier Pharmacy had ample reason to suspect that
5  the IVIG prescriptions were forged, and they knowingly and willfully offered and
6  paid remuneration to Judy Azar in exchange for the forged prescriptions. At a
7  minimum, they acted in deliberate ignorance and reckless disregard of the falsity of
8  the prescriptions by failing to investigate and confirm their veracity.

9      104.   Further, Samuel and Premier Pharmacy had knowledge that the claims
10  for IVIG administration that they presented to the United States for payment were
11  false or fraudulent, and that they were using false records or statements material to
12  false or fraudulent claims, because they knew that the clinical progress notes
13  underlying the claims were fictitious and were not written by a licensed clinician
14  for the reasons set forth herein.

15      105.   Mr. Samuel and Premier Pharmacy also had knowledge that they were
16  improperly avoiding an obligation to pay or transmit money to the Government. On
17  information and belief, they had actual knowledge at all times that the payments
18  they received for the supply and administration of IVIG were overpayments that
19  created a duty to return the overpayments to the United States. At minimum, Mr.
20  Samuel and Premier Pharmacy acted in deliberate ignorance and reckless disregard
21  of the fact that they received overpayments when they failed to investigate the
22  forged prescriptions and falsified clinical progress notes supplied by Judy Azar. At
23  the least, they had actual knowledge that they had received overpayments following
24  the discussion between Dr. Mills and Mr. Samuel regarding Judy Azar and the
25  IVIG prescriptions, as evidenced by Premier Pharmacy firing Ms. Azar.

26
27
28

*Cienega Pharmacy*

106.   Cienega Pharmacy knowingly participated in the fraudulent scheme described in this complaint. Cienega Pharmacy had knowledge that the claims for IVIG supply and administration that it presented to the United States for payment were false or fraudulent, and that it was using false records or statements material to false or fraudulent claims.

107.   On information and belief, Cienega Pharmacy had actual knowledge that Judy Azar was unqualified to administer IVIG because she is not a Registered Nurse, and that Ms. Azar was not administering IVIG to patients, and yet it knowingly and willfully offered and paid remuneration to Ms. Azar in exchange for IVIG administration. At minimum, Cienega Pharmacy acted in deliberate ignorance and reckless disregard of this information by failing to investigate Ms. Azar's invoices.

108.   Cienega Pharmacy also had knowledge that it was improperly avoiding an obligation to pay or transmit money to the Government. On information and belief, it had actual knowledge at all times that the payments it received for the supply and administration of IVIG were overpayments that created a duty to return the overpayments to the United States. At minimum, Cienega Pharmacy acted in deliberate ignorance and reckless disregard of the fact that it received overpayments by failing to investigate Ms. Azar's invoices.

*MedQuick*

109.   MedQuick knowingly participated in the fraudulent scheme described in this complaint. MedQuick had knowledge that the claims for IVIG supply and administration that it presented to the United States for payment were false or fraudulent, and that it was using false records or statements material to false or fraudulent claims.

110.   On information and belief, MedQuick had actual knowledge that Judy Azar was unqualified to administer IVIG because she is not a Registered Nurse, and that Ms. Azar was not administering IVIG to patients, and yet it knowingly and willfully offered and paid remuneration to Ms. Azar in exchange for IVIG administration. At minimum, MedQuick acted in deliberate ignorance and reckless disregard of this information by failing to investigate Ms. Azar's invoices.

111.   MedQuick also had knowledge that it was improperly avoiding an obligation to pay or transmit money to the Government. On information and belief, it had actual knowledge at all times that the payments it received for the supply and administration of IVIG were overpayments that created a duty to return the overpayments to the United States. At minimum, Cienega Pharmacy acted in deliberate ignorance and reckless disregard of the fact that it received overpayments by failing to investigate Ms. Azar's invoices.

### *Emmanuel Lim and ERL Medical Corporation*

112.   Emmanuel Lim and his company, ERL Medical Corporation, knowingly participated in the fraudulent scheme described in this complaint. Dr. Lim and ERL had knowledge that the claims for IVIG supply that they presented to the United States for payment were false or fraudulent, and that they were using false records or statements material to false or fraudulent claims, because they knew that the IVIG they obtained from Judy Azar was misbranded, adulterated, and purchased from unlicensed personnel.

113.   Dr. Lim and ERL had actual knowledge that they were purchasing IVIG from a Medical Assistant, Judy Azar, and not from Dr. Mills or from a duly licensed pharmacy or distributor, and that the IVIG was not being stored, maintained, or transferred according to safety requirements. At minimum, Dr. Lim and ERL acted in deliberate ignorance and reckless disregard of this information by failing to confirm that they were purchasing IVIG through proper channels.

114.   Dr. Lim and ERL also had knowledge that they were improperly avoiding an obligation to pay or transmit money to the Government. On information and belief, they had actual knowledge at all times that the payments they received for the supply of IVIG were overpayments that created a duty to return the overpayments to the United States. At minimum, Dr. Lim and ERL acted in deliberate ignorance and reckless disregard of the fact that they received overpayments when they failed to confirm that they were purchasing IVIG through proper channels. At the least, they had actual knowledge that they had received overpayments following the discussion between Dr. Mills and Dr. Lim regarding their acquisition of IVIG from Judy Azar.

## VII.   COUNTS

### COUNT I:  FALSE CLAIMS
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A) (Presenting False Claims As to All Defendants)**

115.   Relator hereby incorporates and re-alleges each allegation in each of the preceding paragraphs as though fully set forth herein, and further alleges as follows:

116.   Defendants, by and through their agents, officers, and employees, knowingly presented or caused to be presented to Medicare, Medi-Cal and other federally funded health care programs false or fraudulent claims for IVIG and associated costs for infusing the drug. Accordingly, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

117.   In engaging in the conduct alleged above, Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

118.   As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation occurring before and including November 2, 2015, and of not less than $10,781 and up to $21,563 per violation for violations occurring after November 2, 2015.

### COUNT II:  FALSE CLAIMS
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B) (Using False Statements As To All Defendants)

119.   Relator hereby incorporates and re-alleges each allegation in each of the preceding paragraphs as though fully set forth herein, and further alleges as follows:

120.   Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to claims for reimbursement to Medicare and other federal health care programs for Taxotere at inflated prices. These false records and statements included among others, Defendants' fraud upon the United States Patent Office in obtaining the Invalid Patents. Accordingly, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

121.   In engaging in the conduct alleged above, Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

122.   As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered damages in an amount to be determined at trial United States has suffered damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not

1    less than $5,500 and up to $11,000 for each violation occurring before and

2    including November 2, 2015, and of not less than $10,781 and up to $21,563 per

3    violation for violations occurring after November 2, 2015.

4    **COUNT III:  FALSE CLAIMS**

5    **Federal False Claims Act**<br>**31 U.S.C. § 3729(a)(1)(C) (Conspiracy As to Defendants Steven Samuel,**

6    **Premier Pharmacy, Judy Azar and Terra Nova)**

7         123.   Relator Mills hereby incorporates and re-alleges paragraphs 1 through

8    as though fully set forth herein.

9         124.   In this Count, Relator seeks relief against Defendants Premier

10    Pharmacy, Steven Samuel, Judy Azar, Terra Nova, Emmanuel Lim and ERL

11    Medical Corporation under 31 U.S.C. § 3729(a)(1)(C).

12         125.   Steven Samuel and, Judy Azar, individually and/or through Premier

13    Pharmacy and Terra Nova respectively, entered into agreements with each other and

14    conspired to knowingly present or cause Premier Pharmacy to submit false claims

15    to Medi-Cal, Medicare and/or other federally funded prescription drug insurance

16    programs. Specifically, these claims include those for the biologic IVIG and claims

17    for the associated costs of infusing the drug. These defendants agreed that Azar

18    would prepare forged IVIG prescriptions and that in return for filling them and

19    seeking reimbursement from the federal and state government with respect thereto,

20    Azar would be paid by Premier Pharmacy as if she was performing infusions on

21    patients. These payments, however, were illegal kickbacks.

22         126.   Accordingly, Samuel, Premier Pharmacy, Azar and Terra Nova

23    conspired to commit violations of 31 U.S.C. §§ 3729(a)(l)(A) and 3729(a)(l)(B) in

24    violation of 31 U.S.C. § 3729(a)(l)(C).

25         127.   As a result of Samuel, Premier Pharmacy, Azar and Terra Nova's

26    violations of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered damages in

27    an amount to be determined at trial and therefore is entitled to treble damages under

28

1    the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000

2    for each violation occurring before and including November 2, 2015, and of not less

3    than $10,781 and up to $21,563 per violation for violations occurring after

4    November 2, 2015.

5    **COUNT IV:  REVERSE FALSE CLAIMS**

6    **Federal False Claims Act**
     **31 U.S.C. § 3729(a)(1)(G) (Obligation to Return Overpayments As To All**

7    **Defendants)**

8        128.   Relator hereby incorporates and re-alleges each allegation in each of

9    the preceding paragraphs as though fully set forth herein, and further alleges as

10   follows:

11       129.   Defendants knowingly made or used, or caused to be made or used

12   false records or statements material to an obligation to pay or transmit money to the

13   United States, or knowingly concealed or knowingly and improperly avoided or

14   decreased an obligation to pay or transmit money to the United States in violation

15   of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

16       130.   The Defendants received overpayments pursuant to 42 U.S.C. §

17   1320a-7k. These overpayments were retained by Defendants after the deadline for

18   reporting and returning them, and as such they constitute obligations, as the term

19   obligation is used in the False Claims Act, 31 U.S.C. § 3729(a).

20       131.   Such false records or statements or concealment, avoidance or

21   decrease of an obligation to pay or transmit money to the United States were made

22   or done knowingly, as defined in 31 U.S.C. § 3729(b)(1).

23       132.   Because of Defendants' acts, the United States has sustained damages

24   in an amount to be determined at trial and therefore is entitled to treble damages

25   under the False Claims Act, plus civil penalties of not less than $5,500 and up to

26   $11,000 for each violation occurring before and including November 2, 2015, and

27

28   ——————————————————————————

of not less than $10,781 and up to $21,563 per violation for violations occurring after November 2, 2015.

## COUNT V
### California False Claims Act
### Cal. Gov't Code §§ 12651(a)(1), (2), (3), (7) & (8) (As To All Defendants With The Exception Of Conspiracy)

133. Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

134. By virtue of the acts described above, the Defendants "[k]nowingly present[ed] or cause[d] to be presented a false or fraudulent claim for payment or approval" in violation of Cal. Gov't Code § 12651(a)(1).

135. By virtue of the acts described above, the Defendants "[k]nowingly ma[de], use[d], or cause[d] to be made or used a false record or statement material to a false or fraudulent claim" in violation of Cal. Gov't Code § 12651(a)(2).

136. By virtue of the acts described above, Defendants Azar, Terra Nova, Stephen Samuel, and Premier Pharmacy conspired to commit a violation of this subdivision in violation of Cal. Gov't Code Section 12651(a)(3).

137. By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d], or cause[d] to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state …, or knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money … to the state …" in violation of Cal. Gov't Code § 12651(a)(7).

138. By virtue of the acts described above, the Defendants have violated Cal. Gov't Code Section 12651(a)(8).

139. The State of California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or

1  presented by Defendants, paid claims that would not be paid but for Defendant's

2  acts and conduct alleged herein.

3      140.  By reason of Defendants' acts, the State of California has been

4  damaged, and continues to be damaged, in a substantial amount to be determined at

5  trial. Pursuant to Cal. Gov't Code § 12651(a), the State of California is entitled to

6  three times the amount of actual damages plus a penalty of $5,500 to $11,000 per

7  violation.

8  **VIII. PRAYER FOR RELIEF**

9      WHEREFORE, Relator respectfully requests that this Honorable Court enter

10  judgment in its favor and in favor of the United States of America and against

11  Defendants as follows:

12      A.    For the United States, treble damages and civil penalties of not less

13  $5,500 and up to $11,000 for each violation occurring before and including

14  November 2, 2015, and of not less than $10,781 and up to $21,563 per violation for

15  violations occurring after November 2, 2015 per false claim, pursuant to the False

16  Claims Act, 31 U.S.C. § 3729(a)(1);

17      B.    For California, treble damages, the costs of bringing this civil action

18  plus a penalty of $5,500 to $11,000 per violation;

19      C.    For pre-judgment interest on all damages awarded;

20      D.    For any and all reasonable costs, expenses and attorneys' fees;

21      E.    For an award to Relator in the maximum amount permissible under

22  law; and

23      F.    For such other and further relief as the Court deems just and equitable.

24

25

26

27

28

COMPLAINT
39

DATED: March 17, 2020

Respectfully submitted,

ZIMMERMAN REED LLP

Christopher Ridout (SBN 143931)
Caleb Marker (SBN 269721)
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781
Christopher.Ridout@zimmreed.com
Caleb.Marker@zimmreed.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Jeanne A. Markey
Gary L. Azorsky
Casey M. Preston
1717 Arch Street, Ste. 3610
Philadelphia, PA 19103
Telephone: (267) 479-5700
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
cpreston@cohenmilstein.com

**ZIMMERMAN REED LLP**
Carolyn G. Anderson
June P. Hoidal
Charles R. Toomajian III (SBN 302153)
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone:  612-341-0400
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Charles.Toomajian@zimmreed.com

COMPLAINT

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE HUBBARD LAW FIRM, P.C.**
Sarah Hubbard
330 E. 18th Street
Brooklyn, NY 11226
Telephone: (917) 902-3606
Facsimile: (718) 233-4193
hubbard@hubbardpc.com

*Counsel for Relator*
*Anthony Mills, M.D.*

COMPLAINT

41

# CERTIFICATE OF SERVICE

I hereby certify that I will cause a copy of the above Complaint to be served on the following counsel by certified U.S. mail:

The Honorable William P. Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

The Honorable Nicola T. Hanna
United States Attorney for the
Central District of California
312 North Spring Street, Suite 1200
Los Angeles, California 90012

The Honorable Xavier Becerra
Office of the Attorney General
State of California
1300 "I" Street
Sacramento, California 95814-2919

Civil Process Clerk
United States Attorney's Office
Central District of California
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2020.

_____
Christopher P. Ridout