O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ANTHONY MILLS, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>JUDY AZAR, et al.,<br><br>Defendants. | Case No.: 2:20-cv-02538-MEMF-PJW<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART WITH LEAVE TO AMEND [ECF NO. 89]** |

Before the Court is the Motion to Dismiss filed by Defendants Stephen Samuel and Good Health, Inc., dba Premier Pharmacy Services. ECF No. 89. For the reasons stated herein, the Court hereby GRANTS IN PART the Motion to Dismiss with leave to amend.

/ / /

/ / /

1

## I. Background

### A. Factual Background[1]

Intravenous immunoglobulin ("IVIG") is an antibody therapy derived from human plasma used to treat peripheral neuropathy. TAC ¶ 1. At one point, IVIG was commonly prescribed to HIV/AIDS patients suffering from chronic inflammatory demyelinating polyneuropathy ("CIDP"). *Id.* It is an expensive treatment that is reimburseable by federal and state governments. *Id.*

Judy Azar[2] was at all relevant times employed full-time as an unlicensed medical assistant by SoCal Men's Medical Group in Los Angeles (the "Medical Group"), of which Relator Anthony Mills is President. *Id.* ¶ 2. While at the Medical Group, Azar created fake IVIG prescriptions and fake prior approval letters without Mills's knowledge, and falsely represented that they were written by Mills. *Id.* Meanwhile, Azar was being compensated by Defendant Good Health, Inc. dba Premier Pharmacy Services ("Premier") as a full-time employee despite never having a physical presence at Premier (as Azar was working physically full-time at the Medical Group). *Id.* ¶ 3. Premier then submitted the false claims to the government, knowing they were fake. *Id.* Individual Defendant Stephen Samuel is Premier's CEO and owner. *Id.* ¶ 4. In addition to submitting false claims for IVIG prescriptions, Premier submitted false claims for infusion sessions which never took place—purportedly administered by Azar, who was unlicensed to do so. *Id.* ¶¶ 3–4. Premier would also purchase IVIG, which was then given to Azar who sold it on the black market at a large discount off commercially available prices. *Id.* ¶ 5.

Beyond IVIG, Premier also engaged in a fraudulent scheme involving an antiretroviral drug, Truvada. *Id.* ¶ 7. Premier acquired the drug on the black market at discounted prices, then repackaged and dispensed the drugs to its customers, bypassing legitimate supply channels and the

---

[1] All facts stated herein are taken from the allegations in Plaintiff's Third Amended Complaint unless otherwise indicated. ECF No. 87 ("TAC"). For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they are true.

[2] Terra Nova Enterprises, Inc. ("Terra Nova") is a suspended California corporation founded by Azar and Christopher Morton (believed to be Azar's boyfriend) as a front for Azar's illegal activities. *Id.* ¶ 22. Per the TAC, all references to Azar also include Terra Nova.

attendant regulations designed to protect patient safety. *Id.* Premier then submitted false claims for reimbursement of these drugs. *Id.* In late 2022, Premier settled an enforcement action brought by the California Board of Pharmacy that alleged, among other things, that Premier was in possession of numerous misbranded and adultered drugs, and purchase of drugs from an unlicensed wholesaler. *Id.* Since the filing of this action, Azar has been charged with and pleaded guilty to health care fraud, bank fraud, aggravated identity theft, and subscription to a false tax return. *Id.* ¶ 9.

### B. Procedural History

On March 17, 2020, Relator Anthony Mills filed the instant *qui tam* action against Defendants Premier, Samuel, Azar, Terra Nova, Cienega Pharmacy, Inc., Medquick Prescription Shoppe, Inc., Emmanuel Lim, and ERL Medical Corporation. ECF No. 1. On January 29, 2021, Mills filed a First Amended Complaint. ECF No. 35. After seeking and receiving leave from the Court to do so, Mills filed a Second Amended Complaint on February 8, 2022. ECF No. 45. The Court granted a stipulation filed by the parties for Mills to further amend, and Mills filed the operative Third Amended Complaint on September 29, 2023, leaving solely Samuel and Premier as defendants in this case. ECF No. 87. The TAC brings six causes of action against Samuel and Premier ("Defendants"): five for violations of the federal False Claims Act including (1) presentation of false claims under Section 3729(a)(1)(A), (2) the making of false statements material to false claims under Section 3729(a)(1)(B), (3) payment of kickbacks, (4) conspiracy to submit false claims, and (5) reverse false claims (retention of overpayments); and (6) one claim for violation of the California False Claims Act. *See generally* TAC.

On November 28, 2023, Defendants filed a Motion to Dismiss the TAC. ECF No. 89 (the "Motion"). On January 23, 2024, Mills filed an opposition. ECF No. 96 ("Opposition"). On February 15, 2024, Defendants filed their reply. ECF No. 97 ("Reply").

## II. Applicable Law

### A. Rule 12(b)(6)

Under Federal Rule of Civil Procedure Rule 12(b)(6), a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to "enable defendants to challenge the legal sufficiency of claims asserted in a

complaint." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court may properly dismiss a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts to support a cognizable legal theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Moreover, Federal Rule of Civil Procedure 9(b) states that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, the "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). Additionally, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (quoting *In re Glenfed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). Rule 9(b)'s

heightened pleading standard applies not only to federal claims, but also to state law claims brought in federal court. *Id.* at 1103.

A district court should generally grant leave to amend freely. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). However, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Id.*

### B. False Claims Act

The False Claims Act ("FCA") prohibits the submission of false or fraudulent claims to the federal government and imposes liability on an individual who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who knowingly makes a "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). A claim under the False Claims Act requires a showing of: (1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. *United States ex rel. Campie v. Gilead Sci., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)). "A claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for the purposes of [the federal False Claims Act]." 42 U.S.C. § 1320a-7b(g)

Rule 9(b)'s heightened pleading standard applies to the False Claims Act. *Ebeid v. ex rel U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). However, a relator need not identify representative examples of false claims to support every allegation. *Id.* Rather, "use of representative examples is simply one means of meeting the pleading obligation." *Id.* Under Rule 9(b), "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* at 998–99 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). However, even under this "relaxed standard," a relator "must provide enough detail 'to give [defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge.'" *Id.* at 999 (quoting *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051–52 (9th Cir. 2001)).

### III. Discussion

Defendants bring their Motion on the basis that the TAC does not plead fraud with sufficient particularity under the heightened Rule 9(b) standard, and that it fails to state a claim under Rule 12(b)(6). For the reasons discussed below, the Court finds the TAC sufficiently pleaded at this stage, except for Count III as to kickbacks to Goldstein only.[3]

#### A. The Allegations Satisfy Rule 9(b)'s Heightened Pleading Standard as to Counts I, II, IV, V, and VI.

Under Rule 9(b), a plaintiff is required to "state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid*, 616 F.3d at 998 (internal quotations omitted). However, to allege a false claim violation, a relator may proceed through an "implied false certification" theory—this requires pleading "with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Id.* In particular, a relator does not have to "identify representative examples of false claims to support every allegation," but may allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 998–99.

Here, Defendants argue that the TAC does not identify any false claims that they submitted, nor provide anything more than speculation that the claims may have been submitted. Motion at 6. But, under *Ebeid*, the TAC does not need to identify the actual submission of any false claims—it only needs to provide "particular details of a scheme to submit false claims." *Ebeid*, 616 F.3d at 999.[4] Therefore, that the TAC does not specifically identify any individual claim submitted and paid

---

[3] The Court does not dismiss Count III in its entirety as it finds that kickbacks to Azar have been sufficiently pleaded.

[4] The TAC generally alleges that false claims were submitted. *See, e.g.,* TAC ¶ 132–139. The Court understands Defendants' argument on this issue to be that no specific false claim is identified, and addresses it as such in this order.

out by a government entity, for example, is not fatal. The Court first finds that the TAC sufficiently alleges with particularity a scheme to submit false claims:

- In late 2018 to early 2019, Mills discovered that Azar had been engaged in illegally selling or administering IVIG because (1) an investigator from the Medical Board of California notified him that it was investigating sales of IVIG to Dr. Emmanuel Lim, who was using unusually high amounts of IVIG with his patients, and that the Medical Group was purportedly selling IVIG to Dr. Lim with Azar as the point person for these sales, (2) a new nurse manager hired at the Medical Group learned that Azar had been ordering extra IV supplies despite the limited use of IV's at the clinic; and (3) an internet search revealed that Azar was purportedly running a nursing agency belonging to Terra Nova, with a listed address the same as the Medical Group's. TAC ¶ 85.
- Mills initiated an investigation of Azar's files, which revealed that Azar had been (1) engaged in falsifying prescriptions for IVIG which were being directed to and filled by Premier, (2) falsely representing in invoices to Permier that she was administering infusions of IVIG, (3) falsely representing herself as a registered nurse, and (4) being paid by Premier on a full-time basis as early as February 2014. TAC ¶ 87–88.[5]
- Mills contacted Samuel via phone, during which Samuel acknowledged the prescriptions from Azar were being filled and that sometimes the drugs were delivered to patients, while other times the drugs were delivered directly to Azar. TAC ¶ 90. Samuel stated that he would conduct his own investigation into Azar. *Id.* Around March 18, 2019, in an apparent attempt to convince Mills about the legality of Azar's activities, Samuel faxed to

---

[5] The TAC details the findings of this investigation, including a summary of the invoices for the purported infusion sessions, the amount of compensation paid to Azar, and authorizations with signatures that Mills identified as fake. *Id.* Although Defendants argue that the TAC insufficiently pleads the "who, what, when, where and how" of the fraudulent conduct, the Court finds that these details satisfy these requirements. For example, the TAC identifies specific fake refill authorizations found in Azar's possession, like one dated April 14, 2014, which was faxed to Premier (presumably by Azar).

        Medical Group examples of progress notes memorializing infusion sessions conducted by Azar, which Mills recognized as fake. *Id.* ¶ 91.[6]

- Mills also contacted Dr. Lim, who stated that Azar always delivered the drugs and that he had been purchasing IVIG from her for four to five years. TAC ¶ 95.

These allegations include many details regarding the "who, what, when, where and how" of the fraudulent conduct alleged, and provide a detailed picture of the scheme at issue involving IVIG. Defendants' argument that the TAC does not so allege the "who" is not well taken—the TAC explains at length actions taken by Azar, Samuel, and Premier.[7] And, the TAC further details the remaining Rule 9(b) requirements. For example, Azar faked prescriptions and Samuel and Premier filled them, and then paid her a kickback in the form of a $45,000 salary for the first seven months of 2018. That the alleged fraudulent conduct occurred over a manner of years should not make the pleading burden *more* onerous for a relator. *See United States v. United Healthcare Insurance Company*, 848 F.3d 1161, 1180 (9th Cir. 2016) (explaining that "a complaint need not allege 'a precise time frame'").[8] Finally, it is clear that the allegations relate to Defendants' conduct in its California locations, as that is where all individuals and events involved are alleged to be located. TAC ¶¶ 21, 23, 80, 88.

The TAC also separately alleges a scheme with regards to Premier's purchase of black market drugs, which the Court also finds to be pleaded with particularity. Specifically, the TAC alleges (1) the who—Premier/Samuel and Julian Goldstein, an individual who regularly sought out

---

[6] The TAC details at length why Mills believed the progress notes to be fake. *Id.*

[7] It is also not clear how Mills should further distinguish Premier and Samuel—Premier is a corporation (which cannot act on its own) for which Samuel is the sole owner and CEO. TAC ¶ 17. The TAC sufficiently identifies instances in which Samuel acted, but liability in this case is logically attributable to both him and his company through which he acted.

[8] Defendants cite cases where district courts have found pleading a range of time insufficient, but such authority is not binding on this Court, nor are the cited cases on point. For example, in *Driscoll*, the court did not find that alleging a range of time to be insufficient—it merely noted a discrepancy between the time frame in the allegations. *Driscoll v. Todd Spencer M.D. Medical Group, Inc.*, 2013 WL 3367568, at *4 (E.D. Cal. July 5, 2013). Moreover, unlike cases where a plaintiff *only* identified a time range, Defendants themselves acknowledge that specific dates *are* identified in the TAC. Motion at 13. The Court addresses the argument of whether these claims have sufficient connection to actual false claims later on.

8

and acquired Truvada on the black market at Samuel's direction (FAC ¶ 101); (2) the what—the purchase of drugs from the black market and disbursement of them as misbranded products; (3) the when—ongoing through at least September 24, 2020 (FAC ¶ 107); (4) the where—in Premier's California offices (FAC ¶ 130); (5) the how—a misbranding scheme similar to the scheme alleged by Truvada's manufacturer (FAC ¶ 115). To the extent that any details are missing, such as how much and when Goldstein was paid by Premier, it is logical that Mills would not be privy to such information at this stage, and more importantly, it is not required under governing law, given this Court's other findings. Notably, the TAC contains a robust factual basis for the allegations. For example, the allegations describe how Mills called Marva Brannum, the Director of Clinical Pharmacy at Premier, around October 15, 2020, and learned that Goldstein was "buying unused Truvada from patients prescribed the drug and selling to Premier Pharmacy, which then repackaged and redispensed the drug." FAC ¶ 110. The details surrounding the allegations in the TAC satisfy the purpose of Rule 9(b) and give sufficient notice to Defendants of the "particular misconduct which is alleged to constitute the fraud charged" so that they may defend against the charge. *Ebeid*, 616 F.3d at 999.

Nevertheless, counsel for Defendants raised at the hearing that Count III was not sufficiently pleaded as to alleged kickbacks paid to Goldstein for HIV/AIDS patients referred to Premier. *See* FAC ¶¶ 101, 110, fn.20. In particular, Defendants argued that the facts underlying the alleged payments to Goldstein in exchange to the referral of patients do not create an inference that the payments were kickbacks as defined under the Anti-Kickback Statute.[9] Counsel for Mills argued that an inference can be drawn that the payments are kickbacks because the allegations qualify the payments from Premier to Goldstein as "significant" and "generous," but the Court does not find such qualifications to satisfy the requirements of Rule 9(b). FAC ¶ 110, fn. 20. For example, there are no allegations setting forth a basis as to how much would be a normal amount of payment for the

---

[9] A violation of the Anti-Kickback Statute occurs when the defendant: (1) knowingly and willfully (2) offers or pays remuneration (3) to induce the payee to purchase or recommend for purchase (4) any good or service that is reimbursable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2)(B); *see also United States v. Miles*, 360 F.3d 472, 479–80 (5th Cir. 2004).

referral of patients, and why any amounts paid to Goldstein would be abnormal or should be construed to be a kickback. Accordingly, the Court finds that Count III is insufficiently pleaded as to kickbacks to Goldstein only, but will grant Mills leave to amend as it finds that further allegations may address this deficiency.

Next, the Court finds that the allegations are sufficiently reliable to create a strong inference that false claims were submitted. Defendants appear to apply the specific "who, what, when, where and how" requirements of Rule 9(b), which the Court finds applicable regarding the particular details of the scheme, to allegations that false claims were submitted. But, as a relator must only show "reliable indicia that lead to a **strong inference** that claims were actually submitted," logically, the "who, what, when, where and how" of the submission of false claims is not required. *Ebeid*, 616 F.3d at 999 (emphasis added). In joining with the Fifth Circuit on this point, the Ninth Circuit quoted *United States ex rel. Grubbs. v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). *Id*. *Grubbs* made clear that allegations were sufficient at the pleadings stage where a relator "alleges his first-hand experience of the scheme unfolding as it related to him." 565 F.3d at 192. "Taking the allegations of the scheme and the relator's own alleged experience as true, as we must on a motion to dismiss, and considering the complaint's list of dates that specified, unprovided services were recorded amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." *Id.* "It would stretch the imagination to infer the inverse; that the defendant doctors go through the charade [related to the fraudulent conduct] only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." *Id.*

Despite reciting almost a full page of allegations from the TAC in their Motion, Defendants argue that the TAC is "vague and conclusory" in respect to showing a strong inference of submitted claims. Motion at 10–11.[10] However, upon closer examination, Defendants mainly take issue with

---

[10] Defendants also argue that Mills should be able to allege more with regards to the actual submission of false claims due to his "insider knowledge and access to records," but it is unclear how Mills's involvement in the situation alleged would give him any insight into claims submitted by Premier. Motion at 11.

regards to a lack of specifity as to the alleged false claims—a requirement that is expressly disclaimed by *Ebeid*. *See, e.g.,* Motion at 10 (taking issue with allegations related to "unidentified claims on unidentified dates" and "unidentified submissions"); 13 (arguing that the alleged fake invoices "do not reflect any *claims* supposedly submitted" or "where the purported false or fraudulent claims were submitted"); 14 (arguing that the complaint "does not engage in the important step of describing how any fraudulent invoices or notes were incorporated into, and resulted into, any false claims being submitted to any government payer"). As explained at length in *Grubbs* (and adopted by the Ninth Circuit in *Ebeid*), "[c]onfronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted . . . gives defendants adequate notice of the claims." *Grubbs*, 565 F.3d at 191. "In many cases, the defendants will be in possession of the most relevant records . . . with which to defend on the grounds that allegedly falsely-recorded services were not recorded, were not billed for, or were actually provided." *Id.*

*Cafasso*, which Defendants heavily rely on, is distinguishable.[11] *See Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011). There, the Ninth Circuit noted that there was an "obvious alternative explanation" as to the defendant's alleged conduct of withholding disclosure of new inventions, because it wanted to continue to use them as trade secrets. *Id.* at 1057. Here, notably absent from the moving papers are any such "obvious alternative explanations" as to why Azar and Defendants would act as alleged—including creating fake presriptions that IVIG admitted as filled, fake progress notes for infusion services allegedly performed by Azar who was unlicensed to do so, and Defendants' payments to Azar. Defendants merely argue that the allegations "are just as consistent with Defendants' being the victim of Azar's fraud." Reply at 9. But, the TAC alleges in detail that Samuel attempted to cover up Azar's activities by providing fake progress notes to Mills, and that Defendants knew Azar was not a licensed

---

[11] Defendants also rely on *U.S. v. Kitsap Physicians Service*, 314 F.3d 995 (9th Cir. 2002). However, *Kitsap* is distinguishable as it was at the summary judgment stage, where the Ninth Circuit found summary judgment appropriate where the relator failed to "*produce evidence* establishing submission of a single false claim." *Id.* at 1003 (emphasis added).

registered nurse and was employed full-time by the Medical Group. FAC ¶¶ 91–93, 136–137. Rule 9(b) allows plaintiffs to allege scienter "generally," although it must still be plausible. *Winter ex rel. United States v. Gardens Regional Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020). Moreover, "a plaintiff need not prove a 'specific intent to defraud' under the FCA—the Act imposes liability on any person acting 'knowingly,' which includes acting with 'actual knowledge, as well as acting 'in deliberate ignorance,' or 'in reckless disregard of the truth or falsity of the information.'" *Id.* Therefore, for the purpose of providing an "obvious alternative explanation" at the motion to dismiss stage, the argument that Defendants simply did not know they were doing anything wrong holds little weight (nor does the alternative explanation that the alleged conduct did not occur).[12]

Grounds to dismiss do not exist based on a relator's failure to identify "which false claims were submitted and when." *See United Healthcare*, 848 F.3d at 1183 (finding that the pleadings "need not identify specific false [] certifications"); *see also U.S. v. Kaplan, Inc.*, 517 Fed. App'x. 534, 536 (9th Cir. 2013) (noting it was error to rely on lack of identification of false claims to dismiss a claim). The Court finds that the TAC sufficiently alleges both the particular details of a scheme to submit false claims, as well as a strong inference that the claims were submitted.

**B.      The Allegations Are Sufficiently Pleaded Under Rule 12(b)(6)**

In support of their motion under Rule 12(b)(6), Defendants essentially make the same arguments as they made in support of their motion under Rule 9(b)—that the TAC fails to plead

---

[12] Moreover, as pleaded in the TAC, Azar has pleaded guilty to executing a scheme "to defraud health care benefit programs, namely, Medicare," which further leads to a strong inference that claims were submitted. TAC ¶ 10. In support of his Opposition, Relator attaches pleadings from Azar's criminal case. Although no request for judicial notice has been made, the Court finds that the pleadings are appropriate to consider at this stage, as the TAC specifically references Azar's guilty plea and cites from her plea agreement, and they are undisputed matters of public record. TAC ¶¶ 9–10; *see United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (documents not attached to a complaint may be considered if the complaint refers to the document). Nevertheless, Defendants argue that nothing in these documents identify Premier or Samuel as Azar's co-conspirator, and the Court regardless cannot take judicial notice of the facts contained in the documents. Therefore, the Court relies solely on the allegations as pleaded in the TAC for this point—that Azar was charged with and pleaded guilty to health care fraud shortly after the time frame of the allegations creates at least a strong inference that claims were submitted. However, that the government has not at this time sought recoupment against Defendants does not provide equal weight to Defendants' "alternative explanation" on the face of the pleadings. Recoupment may not have been sought for many reasons, including but not limited to the fact that Defendants allegedly stipulated to surrender of their California business operations based on an order from the California Board of Pharmacy. TAC ¶ 130.

"facts to show that Defendants submitted any claim"—into a separate argument under 12(b)(6). Motion at 17. The Court does not find that Rule 12(b)(6) requires a different analysis on this issue than Rule 9(b) requires; Rule 9(b)'s particularity requirement is part and parcel of the Rule 12(b)(6) analysis in the FCA context and Defendants raise no new arguments on it. However, the Court addresses Defendants' argument that the element of materiality has not been met—although the argument is, in essence, also based on the same argument that the TAC has not actually identified any submitted claims. Motion at 17.

"The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Winter*, 953 F.3d at 1121. "For a false statement to be material, a plaintiff must plausibly allege that the statutory violations are 'so central' to the claims that the government 'would not have paid these claims had it known of these violations.'" *Id.* The TAC pleads that Defendants submitted false claims and that Defendants paid kickbacks to Azar and Goldstein, which had the government known about, would have stopped them from paying out any claims to Defendants. TAC ¶¶ 113–114, 132, 148. The Court finds this sufficient. *See Winter*, 953 F.3d at 1122 (materiality sufficient where relator alleged "that the government 'would not' have 'paid' Defendants' false claims 'if the true facts were known'"). The Court does not find that anything more on materiality is required at this stage.[13] Rather, the extent of Defendants' argument appears to be that since there are no identified false claims, materiality as to

---

[13] Defendants cite to *McElligott v. McKesson Corporation*, which is inapposite here. 2022 WL 728903 (9th Cir. March 10, 2022. In particular, the conduct at issue was not alleged to be designated as a "condition of payment." *Id.* at *2. Here, the conduct at issue is alleged to be a condition of payment because the government would not pay for the claim if it knew about the kickbacks. *See, i.e.,* TAC ¶ 148. The Court acknowledges that not every misrepresentation is "material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 194 (2016). However, designated compliance is nonetheless still "relevant" in evaluating materiality (*id.*), and courts have previously found that compliance with the Anti-Kickback statute is material to the FCA. *See, e.g., U.S. ex rel. Macias v. Pacific Health Corporation*, 2019 WL 2396305, at *7 (C.D. Cal. June 5, 2019) ("Several courts have found that compliance with the AKS is material for the purpose of the FCA.").

those claims cannot be "established." Motion at 17. Again, this misconstrues the requirements of pleading an FCA claim. Accordingly, the Court finds that the TAC is sufficiently pleaded.[14]

**IV. Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Motion to Dismiss is DENIED as to Counts I, II, IV, V, and VI;
2. The Motion to Dismiss is GRANTED IN PART as to Count III as it relates to kickbacks made to Goldstein only, with leave to amend;
3. If Relator chooses to amend, Relator is ORDERED to do so within thirty days of this Order.

IT IS SO ORDERED.

Dated: June 11, 2024

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[14] Defendants also raise throughout their Motion that the conspiracy claims fail because they have not been pleaded with particularity, and because the substantive claims under the FCA and California FCA fail. Motion at 10, 16. However, the Court finds the relationship between Defendants and Azar to be sufficiently detailed in alleging "an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *U.S. v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980). The Court also finds the underlying claims sufficiently pleaded, as discussed herein.